# 18-3148

## United States Court of Appeals
### *for the*
### Second Circuit

NEIL SOOROOJBALLIE,

*Plaintiff-Appellee,*

-vs-

PORT AUTHORITY OF NEW YORK & NEW JERSEY,
GARY FRATTALI, Individually,

*Defendants-Appellants.*

———

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF OF PLAINTIFF-APPELLEE

| STEPHEN BERGSTEIN | MARJORIE MESIDOR |
|---|---|
| BERGSTEIN & ULLRICH, LLP<br>5 Paradies Lane<br>New Paltz, N.Y. 12561<br>(845) 469-1277 | PHILLIPS & ASSOCIATES, PLLC<br>45 Broadway<br>New York, N.Y. 10006<br>(212) 248-7431<br><br>*Counsel for Plaintiff Appellee* |

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1. Plaintiff's experience and training . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2. Frattali denies Plaintiff the boiler training course . . . . . . . . . . . . . . . . . 2

    3. Frattali denies Plaintiff the Junior Supervisory Assessment . . . . . . . . . . 3

    4. Plaintiff is denied a meal reimbursement . . . . . . . . . . . . . . . . . . . . . . . . 4

    5. The Watch Engineer position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    6. Frattali harasses Plaintiff through racial slurs . . . . . . . . . . . . . . . . . . . . 6

    7. Plaintiff files an internal EEO charge with Port Authority . . . . . . . . . . . 8

    8. The first February 4, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . 11

    9. The second February 4, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . 12

    10. The first March 27, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . 13

    11. The second March 27, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . 14

    12. The July 17, 2014 counseling memo . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    13. Plaintiff is "forced" to decline the Watch Commander
        position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    14. Plaintiff files a charge of discrimination with the EEOC . . . . . . . . . . . 17

    15. Port Authority accuses Plaintiff of sabotaging equipment . . . . . . . . . . 17

16. Plaintiff's pain and suffering ................................... 18

17. The verdict and post-trial motions ............................... 21

Questions Presented ................................................. 22

Summary of Argument ................................................. 22

Argument ........................................................... 23

Point I ............................................................ 24

Defendants are not entitled to judgment as a matter of law .................... 24

    A.    Defendants waived their rights under Rule 50(b) in making
        a cursory Rule 50(a) motion at trial ............................ 24

    B.    The evidence demonstrates that Defendants created a hostile
        work environment on the basis of race/national origin ............ 25

        1. Standards governing judgment as a matter of law ............. 25

        2. Standards governing hostile work environment claims ........ 26

        3. Frattali created a racially hostile work environment ........... 28

    C.    The district court properly allowed Plaintiff to introduce
        evidence of otherwise time-barred events to prove his claim ...... 32

POINT II ........................................................... 36

The jury instructions did not deprive Defendants of a fair trial ................ 36

    A.    The trial court was not required to charge the jury on pretext ..... 37

    B.    The trial court was not required to issue a "business
        decision" charge ............................................. 38

     C.      The hostile work environment charge was proper . . . . . . . . . . . . . . . 41

Point III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

The damages award does shock the conscience . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Point IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Port Authority cannot invoke the $300,000 statutory cap on Plaintiff's
damages award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Point V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

The punitive damages award is appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     A.      The standard of review is abuse of discretion . . . . . . . . . . . . . . . . . . 50

     B.      The racial harassment was egregious enough to support
           the $150,000 punitive damages award . . . . . . . . . . . . . . . . . . . . . . . . . 51

     C.      The record does not show that the district court denied
           Frattali the opportunity to prove his net worth . . . . . . . . . . . . . . . . . . 54

Point VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

The district did not abuse its discretion in granting Plaintiff's
motion for attorneys' fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Certification of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# Table of Authorities

*Abrahamson v. Bd. of Educ.*,
  374 F.3d 66 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Advance Pharm., Inc. v. United States*,
  391 F.3d 377 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Alfano v. Costello*,
  294 F.3d 365 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Alvarado v. Federal Express Corp.*,
  384 Fed. Appx. 585 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Barham v. Wal-Mart Stores, Inc.*,
  2017 WL 3736702 (D. Conn. Aug. 30, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Ben-Levy v. Bloomberg, L.P.*,
  2012 WL 2477685 (S.D.N.Y. June 26, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Brady v. Wal-Mart Stores, Inc.*,
  455 F. Supp. 2d 157 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Cooper v. Industries, Inc. v. Leatherman Tool Group*,
  532 U.S. 424 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Creacy v. BCBG Max Azria Grp., LLC*,
  2017 WL 1216580 (S.D.N.Y. Mar. 31, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cross v. N.Y.C. Transit Auth.*,
  417 F.3d 241 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Davis-Garett v. Urban Outfitters, Inc.*,
  921 F.3d 30 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Duarte v. St. Barnabas Hosp.*,
  2018 WL 4440501 (S.D.N.Y. Sept. 17, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Duplan v. City of New York,*
    888 F.3d 612 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*EEOC v. Dolgencorp, LLC,*
    277 F. Supp. 2d 932 (E.D. Tenn. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Ettinger v. State Univ. of N.Y.,*
    1998 WL 91089 (S.D.N.Y. March 2, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,*
    136 F.3d 276 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gramercy Advisors, LLC v. Ripley,*
    2014 WL 5847444 (S.D.N.Y. Nov. 12, 2014) . . . . . . . . . . . . . . . . . . . . . . . . 47

*Grant v. Martinez,*
    973 F.2d 96 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Gwozdzinsky v. Magten Asset Mgmt. Corp.,*
    106 F.3d 469 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Henry v. Wyeth Pharmaceuticals, Inc.,*
    616 F.3D 134 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Hill v. City of N.Y.,*
    136 F. Supp. 3d 304 (E.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Howley v. Town of Stratford,*
    217 F.3d 141 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hughes v. PBA,*
    850 F.2d 876 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Iannone v. Frederic R. Harris, Inc.*,
    941 F. Supp. 403 (S.D.N.Y. 1996) ..................................... 53

*King v. Macri*,
    993 F.2d 294 (2d Cir. 1993) .......................................... 55

*Kirsch v. Fleet Street, Ltd.*,
    148 F.3d 149 (2d Cir. 1998) .......................................... 25

*Knipe v. Skinner*,
    999 F.2d 708 (2d Cir. 1993) .......................................... 48

*Lamberson v. Six West Retail Acquisition, Inc.*,
    2002 WL 59424 (S.D.N.Y. Jan. 16, 2002) ............................. 53

*Lewis v. American Sugar Refining, Inc.*,
    325 F. Supp. 3d 321 (S.D.N.Y. Aug. 17, 2018) ................. 29, 51, 52

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012) ....................................... 42, 43

*Mathie v. Fries*,
    121 F.3d 808 (2d Cir. 1997) .......................................... 54

*Matusick v. Erie Cty. Water Auth.*,
    739 F.3d 51 (2d Cir. 2014) ........................................... 25

*Mix v. Delaware & Hudson Ry. Co.*,
    345 F.3d 82 (2d Cir. 2003) ........................................... 35

*Monell v. Dept. of Social Services*,
    436 U.S. 658 (1978) ................................................. 47

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ................................................. 35

vi

*Norton v. Sam's Club,*
    145 F.3d 114 (2d Cir. 1998) ........................................... 57

*Olsen v. County of Nassau,*
    615 F. Supp. 2d 35 (E.D.N.Y. 2009) ................................ 43, 45

*Ortiz v. Jordan,*
    562 U.S. 180 (2011) ..................................................... 48

*Osorio v. Source Enterprises,*
    2007 WL 683985 (S.D.N.Y. March 5, 2007) ......................... 44

*Owens v. New York City Hous. Auth.,*
    934 F.2d 405 (2d Cir. 1991) ........................................... 30

*Paolillo v. Dressler Industries, Inc.,*
    865 F.2d 37 (2d Cir. 1989) ............................................ 41

*Patane v. Clark,*
    508 F.3d 106 (2d Cir. 2007) ........................................... 28

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006)) ....................................... 51, 57

*Patterson v. County of Oneida,*
    375 F.3d 206 (2d Cir. 2004) ........................................ 46, 49

*Payne v. Jones,*
    711 F.3d 85 (2d Cir. 2012) ......................................... 50, 51

*Petrosino v. Bell. Atl.,*
    385 F.3d 210 (2d Cir. 2004) ........................................... 32

*Piesco v. Koch,*
    12 F.3d 332 (2d Cir. 1993) ............................................ 24

*Phillips v. Bowen,*
    278 F.3d 103 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Porter v. Quarantillo,*
    722 F.3d 94 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Pucino v. Verizon Communs., Inc.,*
    618 F.3d 112 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Ravina v. Columbia Univ.,*
    2019 WL 1450449 (S.D.N.Y. March 31, 2019) . . . . . . . . . . . . . . . . . . . . . . . 44

*Redd v. N.Y. State Div. of Parole,*
    678 F.3d 166 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Renz v. Grey Advertising, Inc.,*
    135 F.3d 217 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Rivera v. Rochester Genesee Reg'l Transp. Auth.,*
    702 F.3d 685 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Rothstein v. Carriere,*
    373 F.3d 275 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Smith v. Lightning Bolt Prods., Inc.,*
    861 F.2d 363 (2d Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Summa v. Hofstra Univ.,*
    708 F.3d 115 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Stemmons v. Missouri Dept. of Corrections,*
    82 F.3d 817 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Tatum v. City of N.Y.,*
    2010 WL 334975 (S.D.N.Y. Jan. 28, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Thomas v. City of New York,*
    2017 WL 6033532 (E.D.N.Y. Dec. 1, 2017) .......................... 57

*Thomas v. iStar Financial, Inc.,*
    652 F.3d 141 (2d Cir. 2011) ......................................... 51

*Thorsen v. County of Nassau,*
    722 F. Supp. 2d 277 (E.D.N.Y. 2010) ............................... 45

*Tillery v. Lynn,*
    607 F. Supp. 399 (S.D.N.Y. 1985) .................................. 55

*Tolbert v. Queens Coll.,*
    242 F.3d 58 (2d Cir. 2001) ................................. 26, 30, 56

*Turley v. ISG Lackawanna, Inc.,*
    774 F.3d 140 (2d Cir. 2014) ..................................... 42, 44

*U.S. v. Lange,*
    834 F.3d 58 (2d Cir. 2016) ......................................... 36

*White v. Baxter Healthcare Corp.,*
    533 F.3d 381 (6th Cir. 2008) ....................................... 40

*Whitehurst v. 230 Fifth, Inc.,*
    998 F. Supp. 2d 233 (S.D.N.Y. 2014) ............................... 29

*Wichmann v. Bd. of Trustees of Southern Ill. Univ.,*
    180 F.3d 791 (7th Cir. 1999) .................................... 38, 39

*Woods v. New York City Dep't of Sanitation,*
    1999 WL 476305 (S.D.N.Y. July 8, 1999) ........................... 55

**Statutes**

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 48, 49

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 49

Fed. R. Civ. P. 50(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Preliminary Statement

The jury found that Defendants-Appellants discriminated against Plaintiff-Appellee Neil Sooroojballie on the basis of his national origin and race, awarding $2,160,000 in compensatory damages against Port Authority and $150,000 in punitive damages against Gray Frattali. Defendants challenge that verdict by arguing disputed facts and asserting arguments they waived in the district court. The jury properly found in Plaintiff's favor, as Frattali discriminated against Plaintiff through racially offensive statements, adverse counseling memos, scuttling Plaintiff's promotional efforts and falsely accusing him of sabotaging equipment. As Defendants received a fair trial and the damages awards do not shock the conscience, the judgment should stand.

## Statement of Facts

### 1. Plaintiff's experience and training.

Plaintiff Neil Sooroojballie is a 38-year-old man who was born in Guyana and came to the United States 11 years ago. (JA 497-98). His cultural heritage is West Indian and his race is Black and Asian. (JA 497). Plaintiff began working for Defendant Port Authority in January 2001, hired as a Utility System Maintainer (USM) stationed at LaGuardia Airport and handling heating and cooling issues. (JA 498-99). The USM services and maintains the boilers and air conditioning equipment throughout the airport. (JA 499). Plaintiff was usually the

sole USM on duty, and he worked with an engineer. (*Id.*) His direct supervisor was Michael Ward. (JA 513). Defendant Gary Frattali supervised Ward. (*Id.*)

Plaintiff has an associate's degree in HVAC and heat and air-conditioning and refrigeration and holds various licenses in New York and New Jersey, which authorize him to operate and maintain a high-pressure boiler. (JA 498, 503-04). Other licenses certify Plaintiff to operate "chillers of any size," all-residential back head burners, commercial and city multisystems, air-conditioning systems and high-pressure screw guns. (JA 504-06, 1406-1416). Early on with Port Authority, Plaintiff received praise and various awards for his performance. (JA 500-03, 646-47).

### 2. Frattali denies Plaintiff the boiler training course.

As Plaintiff aspired to become an engineer at Port Authority, he applied to take a boiler training course in summer 2013. (JA 510). However, evincing hostility toward Plaintiff's professional advancement, Frattali refused to approve the training "because it's too much for [Plaintiff] to comprehend." (JA 511, 653-54). Ward also disallowed Plaintiff this training. (JA 512). While Defendants suggested at trial that Plaintiff could have taken the course at BOCES on Long Island, Frattali did not tell Plaintiff that he could take the course in another geographical area. (JA 865-66). Nor did Frattali forward to management Plaintiff's request for training out of Port Authority's district. (JA 977). Frattali

2

did not help Plaintiff find a comparable course that would be acceptable to the agency. (JA 866).

### 3. Frattali denies Plaintiff the Junior Supervisory Assessment.

In summer 2013, Plaintiff sought the Junior Supervisory Assessment Evaluation (JSA), which allows Port Authority to fill supervisory positions. Under that process, Ward was to assess Plaintiff's performance and skill-set and forward his name to Human Resources, which evaluates candidates for promotions. (JA 512-13, 515). While Plaintiff was qualified for the JSA in that he had (1) the educational prerequisites, (2) the work experience and (3) the necessary attendance and discipline records (JA 519-520), he was unable to obtain the necessary "supervisor readiness recommendation." (JA 520).

Ward twice told Plaintiff that Frattali "doesn't want to" perform the JSA. (JA 513, 520). Frattali explained that Plaintiff could evaluate himself, which is prohibited. (JA 513). When Plaintiff again asked about the JSA, Frattali said, "what is it with you type of people. I have two more that's driving me crazy, and now I have you to deal with." (JA 513-14). Frattali was referring to Michael Appiah, who is Guyanese, and Govind Patel, who is from India. (JA 514). At trial, Frattali admitted that he did not complete the JSA for Plaintiff. (JA 521, 977-78). Frattali did conduct the JSA for Salvatore Funaro, who is white and lacked the requisite three years' experience and necessary licenses. (JA 514-15, 522-24,

3

886-87, 977-78, 1505).

**4. Plaintiff is denied a meal reimbursement.**

Plaintiff also ran into Frattali's hostility over the meal reimbursement, for which employees were reimbursed up to $25.00 for holiday meals. (JA 528-29). Frattali approves the meal reimbursements. (JA 663-64). *See also* JA 859. The following episode demonstrated how Frattali even disadvantaged Plaintiff over small matters.

In November 2013, when Plaintiff purchased two meals on the same day, spending less than $25.00, Frattali only approved one meal, reasoning the agency "doesn't know if [Plaintiff was] taking that second meal home for my family." (JA 529, 1420). Yet, while a white co-worker, Michael Murphy, purchased two meals at the same time on one receipt, Frattali approved Murphy's reimbursement for both meals. At trial, Frattali claimed for the first time that this was merely an "oversight." (JA 529-30, 533-35, 861-62, 1024, 1258, 1645). Co-worker Douglas Oggeri (also white) was reimbursed for a meal even though he purchased it at home on Long Island. (JA 530, 859-860, 1024, 1547).

**5. The Watch Engineer position.**

In August 2013, Plaintiff applied for the Watch Engineer position. (JA 525). At the time, Plaintiff had a clean disciplinary record. (JA 526-27). While Plaintiff passed the written and performance portions of the examination (JA 527),

4

he was placed on the eligible list (JA 1449, 1543) even though he did not pass the boiler portion of the test. (JA 707). While passing the boiler portion was not necessary for the position (JA 538, 540), "Frattali made it clear to Mr. Oggeri that he would make sure [Plaintiff] would never become a watch engineer at LaGuardia." (JA 528). *See also* JA 536 ("Plaintiff testified, Frattali "just didn't want me around there. . . . [H]e was trying to block everything that I was trying to do"). Frattali admitted that, when Human Resources asked him to gauge Plaintiff's interest in the Watch Engineer position, he did not even reach out to Plaintiff. (JA 1012-14).

In any event, in November 2013, Plaintiff was placed on the eligibility list for the Watch Engineer position. (JA 539-540). In January 2014, Vincent Piccinich from Human Resources offered Plaintiff the position, which carried a higher salary and would have ultimately allowed Plaintiff to sit for the New York City high-pressure license. (JA 535-36, 993-94, 1646-47, 1649). But, scuttling Plaintiff's professional advancement, Frattali told Plaintiff that he "would never be a watch engineer at this facility" even though Human Resources had signed off on the eligibility list and Frattali lacked authority to reject eligible candidates. (JA 536, 994, 1005-07).

While Frattali claimed Plaintiff was unsuitable for the position because he failed the boiler portion of the Watch Engineer examination, Plaintiff passed the

5

practical portion overall. (JA 537). It was unnecessary for Plaintiff to pass each portion of the practical exam. (JA 537, 540-41). And, it was Frattali who had previously disallowed Plaintiff from ever attending the boiler course. (JA 538, 540). While Frattali testified at trial that he denied Plaintiff certain training for the position for budgetary reasons (JA 1008-09), at deposition, he offered different testimony, claiming he denied the training for administrative reasons. (JA 1010).

An additional anomaly relating to the Watch Engineer position was that, under the agency's confidentiality rules, Frattali was not supposed to know Plaintiff's exam results. (JA 562-64, 1215-16, 1497 ¶ 9). Yet, Frattali conceded that, contrary to protocol, he sought to learn Plaintiff's test results for the boiler portion. (JA 537, 991-92). Due to Frattali's intervention, the job offer was revoked. (JA 600-01).

### 6. Frattali harasses Plaintiff through racial slurs.

After the union tried to assist Plaintiff on the Watch Engineer position denial, he began to receive a series of counseling memos. (JA 539). Although Ward insisted at trial that Frattali did not assist in writing any of the memos (JA 1154-56), Frattali testified that he helped draft them (JA 1259), and he told Plaintiff "that if [Plaintiff] decline[d] the watch engineer position, [Frattali's] going to stop writing me up, he's going to stop harassing me, and he's going to stop doing whatever he was doing." (JA 541). In other words, Frattali would leave

Plaintiff alone if he stopped pursuing the Watch Engineer position.

Frattali began to harass Plaintiff by following him around on the job "and he would constantly look over my shoulder and he would criticize everything that I do. He would yell and he would fight me if I can't get the job done, he's going to try to get somebody else to come and do the job. It's been like this constantly over the past months. That's all he does, whenever I'm there on days and he was there, he would do it." (JA 541-42). Frattali came into work for this purpose even when he was not on duty. (JA 542). This harassment distracted Plaintiff as Frattali "will just stand there, he wouldn't say anything, he will just stand there and then all of a sudden he would start screaming." (*Id.*) *See also* JA 858 (Plaintiff recalled that Frattali showed up during Plaintiff's shift and stood over him while Plaintiff tried to work). Frattali did this "because I was the only Indian in that facility that was trying to elevate in there, and for some reason, I think that he didn't really want me to go anywhere, he just wanted me to remain USM so that way I could be under him at all times." (JA 601-02). After Frattali issued two more counseling memos, prompted by Frattali's promise to stop harassing him, Plaintiff declined the Watch Engineer position that Port Authority had offered to him. (*Id.*) Plaintiff ultimately declined this position on at least three occasions in order to stop Frattali from harassing him any further. (JA 602-03).

Plaintiff deduced that Frattali's hostility was racially-motivated because

7

of an incident that took place when a water leak sprung at the airport on January 9, 2014. (JA 1455-56). On this occasion, Frattali directed Plaintiff to shut off the water even though the police sergeant alone had that authority. (JA 543). Otherwise, shutting off the pumps leaves the airport without water, even if a fire breaks out. (*Id.*) When Plaintiff did not comply with Frattali's directive, Frattali said, "You fucking Indian asshole. Shut the pump down. Are you stupid? . . . That's why you people are the way you are." (*Id.*) *See also* JA 686 (Plaintiff testified that Frattali said, "You fucking Indian asshole, you are supposed to shut the pumps off and you didn't listen. That's why you and your people are the way they are"). At trial, Frattali did not deny yelling at Plaintiff, and he testified that he "elevated [his] voice." (JA 981-82). Further demonstrating his racial bias, after Plaintiff filed a discrimination charge arising from Frattali's actions, Frattali confronted Plaintiff, calling him a "wanna be," stating, "You Indians want to be Americans." Frattali then told Plaintiff that he was "not white" and that Plaintiff should "go back to my country where I came from." (JA 544, 705).

### 7. Plaintiff files an internal EEO charge with Port Authority.

On January 21, 2014, after Frattali called him a "fucking Indian asshole," Plaintiff filed an internal EEO charge against him. (JA 1421-22). Frattali's racial statements also prompted Plaintiff to complain to Frattali's boss, who expressed indifference in telling Plaintiff that he "was blowing everything out of proportion."

(JA 544).  Plaintiff further reported Frattali's racist comments to Human Resources (JA 706), which "did not do anything for me."  (JA 544-45).  Nor did the Port Authority's Equal Employment Opportunity office intervene when Plaintiff filed the charge (JA 545, 1421-22 [EEO complaint]) and verbally told EEO on at least two occasions that Frattali made racist statements about his Indian heritage.  (JA 689-691).  Frattali knew about the charge when Plaintiff filed it, and the EEO office told Frattali that he was prohibited from retaliating against Plaintiff.  (JA 1015-16).  Frattali would ignore that advice, as demonstrated below.

Wayne Turner, Port Authority's Senior EEO Specialist, understood that Plaintiff claimed that Frattali had discriminated against him.  The jury heard evidence about the deficiencies in Port Authority's investigation.  Turner did not ask Plaintiff if he was basing his claim on national origin or racial discrimination.  (JA 762-64, 785-86).  Nor was Turner aware that Plaintiff had a clean disciplinary record until he complained, or that Plaintiff had received accolades for his work.  (JA 810). Instead, Turner conducted a cursory review of the EEO charge, admitting that his office does not always ask the complainant such basic questions as the race of any similarly-situated coworkers.  (JA 763-64, 787-88, 793).  Although Plaintiff claimed Frattali had singled him out, Turner could not recall asking Plaintiff the race of his co-workers.  (JA 796-97).  Nor did Turner speak with Ward about the EEO charge, and Ward was not even contemporaneously

aware that Plaintiff had filed this charge against him and Frattali (JA 1156-58), suggesting that no one had asked Ward about the allegations. While the EEO office sometimes investigates retaliation claims where the employee is written up for something that took place prior to the EEO filing, Turner did not do so in Plaintiff's case, even though Plaintiff (1) filed the EEO charge on January 21, 2014 and (2) received two counseling memos on February 4, 2014 in connection with incidents that took place several weeks earlier. (JA 807-08, 811). More broadly, despite the sequence of events set forth in Plaintiff's discrimination charge, Turner did not suspect retaliation or discrimination, testifying that while employees often file EEO charges because they are being treated unfairly, that does not mean they have asserted a Title VII violation even where, as here, Plaintiff said Frattali had falsified evidence against him. (JA 820-22). At trial, Turner minimized Plaintiff's grievances by insisting they only raised union matters. (JA 823-26). Not surprisingly, Turner did not think Plaintiff had alleged a Title VII claim (JA 797-98) even though his discrimination claim proved victorious at trial.

Further demonstrating Turner's cavalier response to the EEO complaint, while Turner knew that Plaintiff believed that Frattali began retaliating against him because of the EEO charge, Turner did not treat Plaintiff's filing as a retaliation complaint even though Turner conceded "this could be possible retaliation." (JA 788-89). While Turner knew that Frattali was at the center of Plaintiff's

complaints, Turner did not even speak with Frattali about the allegations. (JA 795).

### 8. The first February 4, 2014 counseling memo.

Plaintiff worked for Port Authority for three years without write-ups or counseling memos. (JA 871, 1019-1020). This changed in early 2014 (JA 891), after Plaintiff complained to EEO. (JA 554-55). While Frattali claimed that Plaintiff allowed his performance to decline after his probationary period ended in January 2012, it was another two years before Frattali charged Plaintiff with any misconduct. (JA 1020).

On February 4, 2014, Plaintiff received two counseling memos. (JA 1453-57). The first memo (dated December 30, 2013) accused Plaintiff of taking an extra hour of comp time on December 12, 2013. (JA 1453-54). In fact, Plaintiff took two hours of comp time but was charged for three. (JA 558). In this memo, Plaintiff was also falsely accused of raising his voice and being confrontational with Ward. (JA 676-77, 870, 1453-54). While Ward signed the memo, Plaintiff testified that "the words that was used in that memo was some of the words that Mr. Frattali would use." (JA 679). Recognizing a factual dispute for the jury, Defendants acknowledge that Plaintiff "disputes that he failed to apologize, or that there was confusion." (Def. Br. at 23). Curiously, this episode took place nearly two months before Plaintiff finally received the counseling

memo (JA 1132-33, 1455-56), *after* Plaintiff filed the EEO charge in January 2014, in which Plaintiff explicitly complained about discrimination and retaliation. (JA 1421-22).

### 9. The second February 4, 2014 counseling memo.

On February 4, 2014, Plaintiff received a second counseling memo which concerned the water pump incident that took place on January 9, 2014. (JA 1455). Ward wrote this memo in consultation with Frattali. (JA 1134). During that episode, when the pumps were flowing 8,000 gallons of water per minute into Hanger 4, pursuant to Frattali's directive, Plaintiff tried but could not shut off the water. (JA 681-83). The sergeant, not Plaintiff, was responsible for turning off the pumps. (JA 684-85, 877). And, while Frattali denies saying this, Plaintiff recalled that Frattali called him a "fucking Indian asshole" in connection with this incident. (JA 543; Def. Br. at 25).

At trial, confronted with the Port Authority policy, Frattali acknowledged at trial that "[t]he police sergeant is responsible for determining the cause of the alarm, *i.e.*, fire or water leak, et cetera, . . . issues the appropriate orders or instructions to his crew and the personnel at the fire pump station. The area is restored upon instructions of the police sergeant only[.]" (JA 980, 1457). Implicitly recognizing the factual issues surrounding this dispute, Defendants argue that Plaintiff merely relied upon an "undated, typewriter-created police

12

department document" in claiming the police were responsible for shutting down the fire pumps. (Def. Br. at 24) (referencing JA 1457).

### 10. The first March 27, 2014 counseling memo.

On March 27, 2014, Plaintiff received a counseling memo claiming he failed to turn on the boiler even though temperatures fell below freezing overnight. (JA 1458). While Defendants claim this discipline was appropriate because one of Plaintiff's African-American coworkers "did not take issue" with the memo (Def. Br. at 27), Plaintiff's version of this factual dispute was as follows: USMs were directed to turn on the boiler when the temperature fell below 32 degrees for more than eight hours. (JA 561). Otherwise, the engineer – who monitors the temperature from his work location (JA 699-700) – must direct the USM to turn on the boiler. (JA 561, 699). While Port Authority cites testimony from its own witnesses in asserting otherwise (Def. Br. at 28), Plaintiff testified that the temperature did not meet the eight-hour threshold that night, and he received no such directive. (JA 561). The Watch Engineer on duty that night, Eric Francis, told Frattali he would take responsibility for not turning on the boiler. (JA 879). Frattali acknowledged at trial that another supervisor, Angel Camacho, should have advised Plaintiff to switch off the pump. (JA 987-990). Nevertheless, Plaintiff was written up for the incident. Memos like this blocked Plaintiff's promotions with Port Authority. (JA 562).

On March 25, 2014, two days before he received this counseling memo, Plaintiff was again offered the Watch Engineer position. (JA 560). Although Plaintiff wanted this promotion, he declined the offer because he feared Frattali would otherwise retaliate against him. (JA 598, 717). *See also* JA 721 ("I declined that position because [Frattali] threatened me"). When Plaintiff declined this position in April 2014, HR told Plaintiff that he would return to his USM position. (JA 605-06, 1451).

By this point, Plaintiff had a tentative job offer from the Department of Correction. (JA 719-720). Plaintiff completed the "new hire" packet for that position in June 2014. (JA 723-25). Still, Plaintiff did not start work with that department until October 27, 2014. (JA 733, 850). In August 2014, not knowing when he would start at the Department of Correction and fearing that Frattali would retaliate against him, Plaintiff again turned down a Watch Engineer position. (JA 727-28).

### 11. The second March 27, 2014 counseling memo.

On April 24, 2014, Plaintiff received another counseling memo, this one addressing an incident that transpired on February 23, 2014. (JA 607, 1459). The memo was dated March 27, 2014. (JA 1459). (Ward claimed this memo should have been dated April 2, 2014. [JA 1153-54]). Following this incident, but before management belatedly served him with this counseling memo, Plaintiff had

complained to EEO about discrimination. (JA 607).

Although Frattali did not work on the day of the incident, he collaborated with Ward on this memo (JA 985-86, 1154), which claimed that Plaintiff failed to correct a loose boiler coupling and had improperly completed a log entry. (JA 1459). However, Plaintiff did not troubleshoot the boiler because he had just come in for his shift and had to make the rounds at the entire airport (a four-to-five hour task). (JA 695). Referring to Watch Engineer Angel Camacho, Plaintiff testified that "[t]he engineer instructed to leave it until the day instrument technician came in and he will take care of it." (*Id.*) Recognizing the factual dispute surrounding this incident, on appeal, Defendants merely claim that "Plaintiff did not offer any corroboration that Camacho gave him this instruction." (Def. Br. at 27).

### 12. The July 17, 2014 counseling memo.

On July 17, 2014, Plaintiff received a counseling memo in which Frattali claimed that Plaintiff left work without permission. (JA 1650). Despite Defendants' efforts on appeal to show that Plaintiff's testimony on this issue was not credible (Def. Br. at 29-30) and that Defendants' witnesses did not corroborate Plaintiff's testimony, the memo was false; Plaintiff received permission to leave work early with a coworker. (JA 608-09, 702-03, 893-94). Plaintiff had no prior AWOL or attendance issues. (JA 609-610).

**13. Plaintiff is "forced" to decline the Watch Commander position.**

At some point between April 21, 2014 and July 17, 2014, Plaintiff was again offered the Watch Engineer position; he again declined the offer. (JA 610). On July 29, 2014, Plaintiff told Human Resources that he had no choice but to turn down the position, noting that Frattali had threatened to otherwise fire him:

> [T]he reason I am declining the Watch Engineer position here at LaGuardia was not of my free will but I was forced to do so. I don't know if you remember back in January 2014, you offered me the position and my supervisor Gary Frattali responded by saying that I will not be an engineer here at LGA[.] [Y]ou later reply stating that I will NOT get that position. After that . . . I was granted the position and was scheduled to go and do the medical, which I did and was supposed to start my indoctrination process. *But I was confronted by Mr. Frattali[.] [H]e threatened me that if I took the Watch Engineer Position that he will continue to have me written up until he has justifiable reason to get me fired from the Port Authority. He went on saying that if I decline the position that he will stop writing me up and things will be normal again.* I have two kids and a mortgage to pay[.] . . . If I took it now he will want to retaliate against me and I don't want to go through the stress again. I at once even got Doug Egan and EEOC involve[d] in the situation but no one was willing to help me. So Vincent on that being said I don't know if it's the right choice I am making but if its going to give me peace of mind and not being discriminated against then I think am better off not being an Engineer.

(JA 1452; JA 610-11) (emphasis supplied). Although Plaintiff complained in this memo that he feared Frattali would retaliate against him, the Port Authority EEO "did nothing for that complaint," claiming Plaintiff was merely raising a union issue. (JA 630-31).

**14. Plaintiff files a charge of discrimination with the EEOC.**

On May 13, 2014, Plaintiff filed a discrimination charge with the EEOC, which set forth Frattali's discriminatory remarks toward Plaintiff. (JA 626, 799-804; JA 1433 ¶ 25; JA 1435-37 ¶¶ 44, 52). Port Authority contacted the EEOC about the charge on October 2, 2014. (JA 627-28, 1448). Frattali was contemporaneously aware of this charge, making it the third time that Frattali became aware that Plaintiff claimed Frattali had formally discriminated against him. (JA 1017-18). Confirming the agency's indifference toward the charge, although Plaintiff was still a Port Authority employee, Wayne Turner, Port Authority's EEO specialist, did not question Plaintiff about these allegations before concluding that Plaintiff had not alleged a Title VII violation. (JA 801, 804-05, 827-28, 833-34). Nor did anyone from Port Authority speak with Ward about the EEOC charge. (JA 1156).

**15. Port Authority accuses Plaintiff of sabotaging equipment.**

In October 2014, a week or two after Defendants learned that Plaintiff had filed the EEOC charge, Port Authority accused Plaintiff of criminal mischief, sabotaging the boilers at LaGuardia Airport. (JA 618). At trial, Frattali conceded that he had accused Plaintiff of sabotage even though he admittedly lacked evidence to support that allegation. (JA 1018, 1038-39, 1255). Frattali admitted that he only suspected Plaintiff because he had previously written him up, and

because Plaintiff had accused him of discrimination; Frattali believed Plaintiff had sabotaged the boilers to retaliate against Frattali. (JA 1019, 1257). When he accused Plaintiff of this serious misconduct, Frattali knew about the EEOC charge and was aware of Plaintiff's heritage. (JA 1021-24). Frattali also knew he was accusing Plaintiff of a crime. (JA 1254-55). Other than Frattali, no one else thought Plaintiff had vandalized the boilers. (JA 1039-1040).

After hearing Frattali and Michael Appiah discussing how someone had cut the wires from one of the boilers, Plaintiff went home without giving it much thought. (JA 618, 1254-55). Later that day, two men from the Port Authority Inspector General's office went to Plaintiff's house to ask about the criminal mischief, stating that Plaintiff was "singled out as the number one suspect" and was under investigation. (JA 618-620). Plaintiff was suspended with pay on October 17, 2014. (JA 620, 1460). Although EEO Specialist Wayne Turner had "heard about" Plaintiff's suspension arising from the boiler sabotage incident, he was not aware that Frattali was behind the allegation. (JA 815-16). Of his 24 colleagues who had access to the boiler, only Plaintiff was singled out. (JA 621). The Inspector General cleared Plaintiff of the charges in early 2015. (JA 629).

### 16. Plaintiff's pain and suffering.

The stress associated with Frattali's harassment led Plaintiff to avoid Frattali at work, often eating lunch alone in his truck. (JA 612). Plaintiff also

explained how the work stress affected him:

> I started to question myself, I have to be doing something wrong. You know, I tried everything possible to do everything better but there was never anything I could have done to please him.

> That end very, very bad, you know, for me at that time. I would even lay in my bed at nights and I would think should I go into work the next day. What is he going to do? What is he going to say? And . . . my best days at work is whenever he is not there. I would sit there and think about this and I keep pondering and asking myself, how can I be a husband and a family home? How can I be a family home when this man is taking everything from me? I'm being belittled. I keep questioning my manhood. How can I be a husband I can't even stand up for myself at work. You know, I couldn't even look at my co-workers in their face and talk to them. I feel so embarrassed and so little that at times I just sit and think that, you know, I don't think that this would ever end. And those were the thing that just keep me up at night. And . . . there wasn't any way out of any of these things. And it started to break me down, break me down into something that I didn't see myself as before.

(JA 612-13).

Over time, Plaintiff became "very angry" and could not sleep. (JA 614). He was unable to function at work and took out his anger against his wife and children, and "they couldn't come anywhere next to me." (*Id.*) Under stress, Plaintiff fought "constantly" with his wife, and he thought he was becoming impotent and his life was over. (JA 615-16). "[T]he only way I started to deal with that was I started to drink heavily. When I'm at home I would drink and again I would be resentful at home. I just wouldn't want to be bothered. I would be in my basement and I will drink until I pass out." (*Id.*) Drinking every day was

"the only thing that would take the pain away at that time. . . . [I]t just eases everything for that moment." (*Id.*)

Previously a God-fearing man, Plaintiff now "didn't fear anything" and "let everything go" because "[n]obody was out there willing to help me and now my life I feel it has been taken away from me." (*Id.*) He explained:

> Whenever I'll be drinking . . . just to prove to myself that I'm still a man, whenever I have the urge to have sex, I would pay and I would go and have sex. If I'm at the bar and I have the urge I would go with random people. It doesn't really matter. I was willing to do anything just to prove that the one thing that I had was not taken away from me. The most disgusting thing that I did was I was at the bar and there was this transgender woman . . . and I had sex with her.

(JA 615). This self-destructive behavior was out-of-character (JA 958-59), lasting for months. (JA 617). Plaintiff's job experience was miserable until he left Port Authority in October 2014. (JA 617).

In February 2014, Plaintiff consulted with Dr. Michele Martinho for the first time about his work-related anxiety and insomnia. (JA 938, 948). Dr. Martinho prescribed an antidepressant. (JA 939). A few months later, Plaintiff returned to Dr. Martinho, complaining of increased anxiety and insomnia, for which she again prescribed medication. (JA 940, 943, 948-49).

As a result of the stress and anxiety, in 2014, Plaintiff began seeing a psychiatrist, Dr. Stanley Schneider, once a week for four to five months. Plaintiff continued to see a doctor for two months after leaving Port Authority. (JA 616,

631-32, 731). Plaintiff saw Dr. Schneider on 14 occasions. (JA 731, 960). Plaintiff's "chief complaint that he was being abused and intimidated by his supervisor, and that was making him very anxious and he had no out because if he left the company, he . . . was trying to get a license in engineering. He had another year to go and he was terrified of leaving." (JA 955). Plaintiff also told Dr. Schneider about Frattali's racist comments. (JA 955-56). In addition, Plaintiff said the work-related stress was hurting his family relationships. (JA 956). Plaintiff was prescribed medication for anxiety, sleeplessness and erectile dysfunction. (JA 616). Even with the medication, when Plaintiff saw Frattali, he felt like he was going to "pass out." (*Id.*)

### 17. The verdict and post-trial motions.

Following a week-long trial, the jury found that Defendants subjected Plaintiff to a hostile work environment on the basis of race or national origin. The jury awarded Plaintiff $2,160,000 in damages for pain and suffering. The jury also awarded $150,000 in punitive damages against Frattali. (JA 1400-01). The district court denied Defendant's post-trial motions for judgment as a matter of law and a new trial/remittitur. (SPA 2). The district court also granted Plaintiff's motion for attorneys' fees in full. (JA 2446).

## Questions Presented

1. Did the jury have a sufficient evidentiary basis to find that Plaintiff was subjected to a hostile work environment on the basis of his national origin?

2. Did the trial court properly allow Plaintiff to introduce evidence of otherwise time-barred evidence in support of his hostile work environment claim?

3. Did the trial court properly charge the jury?

4. Were the damages for pain and suffering and punitive damages excessive as a matter of law?

5. Did the trial court abuse its discretion in granting Plaintiff's application for reasonable attorneys' fees and costs?

## Summary of Argument

The evidence supports Plaintiff's successful hostile work environment. Plaintiff's supervisor, Frattali, repeatedly subjected Plaintiff to slurs relating to his national origin, and Plaintiff was subjected to a series of adverse actions that the jury reasonably concluded were motivated by discriminatory animus. In challenging the verdict, Defendants repeatedly claim that Plaintiff's testimony was not corroborated and otherwise highlight their side of the story, a tactic that improperly second-guesses the jury's credibility determinations.

The jury was properly charged on the hostile work environment claim, and the trial court did not err in denying Defendants' request for inappropriate jury

charges, including ones covering pretext and Defendants' business judgment. Moreover, settled Title VII principles confirm that the district court did not abuse its discretion in allowing the jury to consider otherwise time-barred acts in determining whether Plaintiff endured a hostile work environment.

The damages awards do not shock the conscience, as Plaintiff introduced medical evidence demonstrating how the discrimination left him devastated, requiring medication. As for the punitive damages, the jury was properly outraged at Frattali's racist language in the workplace and the false allegations of poor job performance, culminating in a spurious and retaliatory claim that Plaintiff had vandalized boilers at the airport.

Finally, as Plaintiff was a prevailing party and his attorneys did not duplicate efforts or seek excessive hourly rates, the district court did not abuse its discretion in granting Plaintiff's motion for reasonable attorneys' fees and costs.

## Argument

### Point I

**Defendants are not entitled to judgment as a matter of law**

**A. Defendants waived their rights under Rule 50(b) in making a cursory Rule 50(a) motion at trial.**

Under Rule 50(a)(2), the party seeking JMOL must "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." "Although Rule 50(a) 'does not define how specific' the motion must be . . . the purpose of requiring the moving party to articulate the ground on which JMOL is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.' . . . Accordingly, the JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286–87 (2d Cir. 1998) (citing *inter alia Piesco v. Koch*, 12 F.3d 332, 341 (2d Cir. 1993) (conclusory statement that "[d]efendants move for [JMOL]" was inadequate)).

After Plaintiff put on his direct case, without elaboration, Defendants' counsel stated, "I'd like to move to dismiss for failure to put on a *prima facie* case[.]" (JA 1055-56). As reflected in the jury instructions, Plaintiff's claim at trial was limited to the hostile work environment. (JA 1333-38). Defendants' Rule

50(a) argument articulated no precise basis for relief, and it was unclear what Defendants were asserting, as the hostile work environment analysis does not have a *prima facie* inquiry. Since the Rule 50(a) motion was defective, the standard of review on appeal is "manifest injustice." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998).

### B. The evidence demonstrates that Defendants created a hostile work environment on the basis of race/national origin.

#### 1. Standards governing judgment as a matter of law.

"[A] Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Matusick v. Erie Cty. Water Auth.*, 739 F.3d 51, 72 (2d Cir. 2014).

"A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). Defendants may prevail only when there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair-minded persons could not arrive at a verdict

against it." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004).

"In ruling on a motion for JMOL, the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. . . . In making its evaluation, the court should 'review all of the evidence in the record,' but it must disregard all evidence favorable to the moving party that the jury is not required to believe. . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001).

### 2. Standards governing hostile work environment claims.

"To prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013).

This Court views the evidence "cumulatively in order to obtain a realistic

view of the work environment . . . and to determine whether they alter[ed] the conditions of [plaintiff's] employment and create[d] an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 21 (2d Cir. 2014). "[A] plaintiff need not show that h[is] hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012). "Since one of the critical inquiries with respect to a hostile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant." (*Id.*)

"[I]ncidents that are facially [race]-neutral may sometimes be used to establish a course of [race]-based discrimination – for example, where the same individual is accused of multiple acts of harassment, some overtly [racial] and some not." *Pucino v. Verizon Communs., Inc.*, 618 F.3d 112, 118-19 (2d Cir. 2010) (holding the plaintiff made out a hostile work environment claim on the basis of unequal work assignments and evidence that her supervisor referred to female employees as "bitches," "reflect[ing] hostility to women"); *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could

conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory"); *Howley v. Town of Stratford*, 217 F.3d 141, 156 (2d Cir. 2000) (holding a rational jury could infer that facially-neutral abuse was sex-based because perpetrator had previously made sexually-derogatory statements).

### 3. Frattali created a racially hostile work environment.

Bearing in mind that this Court has "repeatedly cautioned against setting the bar too high," the jury had ample basis to find that Frattali's racial discrimination and harassment altered Plaintiff's work environment "for the worse." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Frattali on three occasions openly disparaged Plaintiff's national origin while he (1) actively interfered with Plaintiff's professional advancement, (2) participated in drafting a series of false counseling memos after Plaintiff filed formal discrimination charges with EEO and the EEOC and (3) falsely accused Plaintiff of having sabotaged a boiler simply because Plaintiff complained about Frattali's racial discrimination.

In connection with one particular workplace episode for which Plaintiff received a counseling memo (JA 1455), Frattali told Plaintiff, "You fucking Indian asshole. Shut the pump down. Are you stupid? . . . That's why you people are the way you are." (JA 543). After Plaintiff filed a discrimination charge, Frattali called Plaintiff a "wanna be," meaning, "You Indians want to be Americans."

Frattali then told Plaintiff that he was "not white" and that Plaintiff should "go back to my country where I came from." (JA 544, 705). While Defendants claim the "you people" comment "could be considered as reference to USMs, not a reference to plaintiff's national origin" (Def. Br. at 43), the jury was free to view it as a racial slur. Courts "consider the use of 'you people' and similar phrases . . . as circumstantial evidence of discriminatory animus[.]" *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 253 n.14 (S.D.N.Y. 2014); *see also Lewis v. American Sugar Refining, Inc.*, 325 F. Supp. 3d 321, 354-55 (S.D.N.Y. 2018) (jury could find that supervisor harbored racial animus in referring to plaintiff as "you people"); *Creacy v. BCBG Max Azria Grp., LLC*, 14 Civ. 10008 (ER), 2017 WL 1216580, at *8 (S.D.N.Y. Mar. 31, 2017) ("a jury can reasonably interpret 'you people' or 'your kind' as having a racial meaning"); *Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 337 (E.D.N.Y. 2015) ("phrases such as 'you people' . . . 'could just as easily be interpreted as [having] a negative racial connotation[,]' particularly when Plaintiffs 'provide greater specificity as to the context of [such phrases'] usage'").

Defendants argue that Frattali denied making these discriminatory statements, no one corroborated them and Plaintiff's testimony on the racial slurs was not credible. (Def. Br. at 30-31, 34, 43). Defendants add that other black employees never heard Frattali use racial epithets. *Id.* at 13-14. But the jury was free to credit Plaintiff's testimony that Frattali made these comments. The jury

could also infer that Plaintiff's discipline (at the hands of Frattali) was therefore discriminatory. *See Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) ("the district court correctly found that the reported comments of Arakel and Lefkowitz relating to Owens' age raised a triable issue as to whether the articulated reasons for her firing were pretextual. While the statements presented were not numerous, they were made by individuals with substantial influence over Owens' employment").

And, while Defendants argue that each counseling memo had a legitimate basis (Def. Br. at 22-30, 41), they overlook how (1) Plaintiff received no such counseling before he charged Frattali with discrimination and (2) Plaintiff disputed the factual predicate for each memo. Credibility assessments are for the jury, which weighs conflicting testimony and disputed evidence, including whether Frattali's racial bias motivated the discipline. *Tolbert*, 242 F.3d at 70; *Owens*, 934 F.2d at 410. The time for Defendants to press these arguments was trial, not on appeal.

Defendants also argue disputed facts surrounding Frattali's other acts of harassment. While Defendants claim Plaintiff was not aggrieved over the JSA because he did not know the qualifications of a similarly-situated white coworker, Funaro (Def. Br. at 16-17), Frattali admitted that Funaro lacked the requisite three years' experience (JA 977-78), and Plaintiff produced direct evidence that Frattali

did not recommend him for the JSA because of his national origin. (JA 513-14).

While Defendants minimize Frattali's refusal to provide Plaintiff boiler training because Plaintiff received it in 2012 and 2013 and Frattali allowed another employee to undergo training outside New York City (Def. Br. at 17-18), the prior training has no bearing on whether Frattali denied Plaintiff other necessary training in 2013, and Frattali's sole reason for this adverse decision was that it was "too much for [Plaintiff] to comprehend," a patronizing justification for this experienced employee. (JA 653-54). Similarly, in discussing the Watch Engineer position (Def. Br. at 19-22), Defendants overlook evidence that Frattali (1) somehow learned about Plaintiff's confidential test results (JA 537, 991-92), (2) made it clear that Plaintiff would "never be a watch engineer at this facility" (JA 536) and (3) did not reach out to Plaintiff when HR expressed interest in Plaintiff for the position. (JA 1012-14). The jury was also free to credit Plaintiff's testimony that he turned down the Watch Engineer position to avoid further antagonizing Frattali, who simply did not want Plaintiff for this position. (JA 610-11, 1452). This supervisor's racist comments toward Plaintiff explain his motives for undermining Plaintiff's professional advancement.

While Defendants also try to explain away the boiler sabotage allegation (Def. Br. at 31-32), they conceded on the Rule 50(b) motion that "Frattali told the inspectors that he suspected plaintiff because plaintiff had circulated a complaint in

July 2014 alleging discrimination." (EDNY ECF 86, at 14). In blaming Plaintiff for this, Frattali allowed his imagination to run wild, stating that Plaintiff vandalized the boiler because he believed he would no longer be working for Port Authority when the damage was discovered. (JA 1532-33). As Frattali cited *inter alia* Plaintiff's pending lawsuit against him during the investigation, blaming Plaintiff was a vicious act of revenge. (*Id.*) This allegation could have ruined Plaintiff's career and landed him in jail. Frattali was the only one who implicated Plaintiff, and the Port Authority ultimately cleared Plaintiff of any charges in early 2015. (JA 629).

### C. The district court properly allowed Plaintiff to introduce evidence of otherwise time-barred events to prove his claim.

On the summary judgment motion, after first determining that Plaintiff could not recover damages for time-barred acts relating to the training denial, the JSA supervisory assessment, the meal reimbursement and a December 30, 2013 counseling memo (JA 437), the district court held that "evidence of earlier . . . denials may constitute relevant 'background evidence in support of a timely claim,' and [the Court] will consider it as such."   (JA 437) (citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004)); *see also* JA 436 ("'[a] charge alleging a hostile work environment claim . . . will not be time-barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least

32

one act falls within the time period").

Defendants argue that the district court improperly allowed Plaintiff to introduce evidence of otherwise time-barred events to support his hostile work environment claim, flowing from the district court's summary judgment ruling that "all time-barred acts could . . . come in as part of the 'ongoing' hostile work environment claim." (Def. Br. at 37).

Since the district court's ruling on the admissibility of otherwise time-barred acts in proving the racial harassment claim was an evidentiary determination, this Court reviews that ruling for an abuse of discretion. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

In *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30 (2d Cir. 2019), this Court vacated summary judgment under circumstances resembling this case. In that case, the plaintiff claimed that, on the basis of age and prior to the 300-day statute of limitations under the ADEA, management assigned her undesirable job tasks, denied her assignments and transferred her to distant work locations. *Id.* at 34. Plaintiff also endured ageist slurs and comments as well as undesirable assignments that pre- and post-dated the statute of limitations. *Id.* at 33-35. While several adverse assignments took place prior to the 300-day statute of limitations, this Court held that all the adverse treatment was relevant to the hostile work environment claim, including the otherwise time-barred discrete acts. After noting

that (1) hostile work environment claims "are different in kind from discrete acts, as their nature involves repeated conduct," and (2) in "a claim of discrete discriminatory retaliatory acts, expiration of the limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim'" (*id*. at 42), this Court held,

> In light of these principles we conclude that the entirety of Garett's ADEA claim that she was subjected to a hostile work environment — being, from the start of her employment with Anthropologie, denial the training given to younger sales associates and relegated to work almost exclusively in the fitting room, and later being assigned to the most unpleasant and arduous duties and subjected to age-disparaging criticisms — was timely. The district court erred in ruling that it could not consider pre-February 16, 2013 events in connection with assessment of liability on the hostile work environment claim[.]

(*Id*.) This reasoning undercuts Defendants' argument that the trial court's evidentiary rulings constituted an abuse of discretion.

While Defendants claim the district court allowed Plaintiff "to piggyback time-barred discrete acts into a hostile work environment claim in order to make them actionable" (Def. Br. at 37-38), the trial court rulings they cite for this proposition apply the incorrect rule that hostile work environment claims cannot include acts of disparate treatment, only "other types of work place behavior, like constant jokes and ridicule or physical intimidation." *Id*. (citing *inter alia Ben-Levy v. Bloomberg, L.P.*, No. 11 Civ. 1554, 2012 WL 2477685, at \*12 (S.D.N.Y. June 26, 2012)). The only appellate ruling that Defendants cite for this proposition

is *Mix v. Delaware & Hudson Ry. Co.*, 345 F.3d 82 (2d Cir. 2003). *Mix* is distinguishable, holding that the continuing violations principle under *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), under Title VII does not apply to the Federal Employers' Liability Act (FELA). *See id.* at 89 ("Whereas Title VII utilizes an 'occurrence-based' trigger for the statute of limitations, the FELA has a 'discovery-based' trigger. As discussed, an FELA claim accrues once the plaintiff knows, or should have known, of both the existence and cause of his injury. As the plaintiff's knowledge, in the exercise of due diligence, is dispositive, it is not relevant whether a single incident of tortious conduct occurs within the filing period"). As Sooroojballie's case does not involve FELA, *Mix* is inapposite.

Finally, while Defendants argue that the introduction of this evidence was "clearly erroneous and highly prejudicial" (Def. Br. at 37), that argument does not compel judgment as a matter of law. First, with one minor exception (when Plaintiff claimed an AWOL memo was retaliatory, JA 609), Defendants did not object to the introduction of this evidence. *See* JA 509-512 (boiler training testimony); JA 512-15 (JSA testimony); JA 528-5355 (meal reimbursement testimony); JA 535-540 (Watch Engineer testimony). Moreover, while Defendants argue that "[t]he bulk of plaintiff's hostile work environment claim involves conduct that was either time-barred or related to the disparate treatment claims that were not actionable or were dismissed" (Def. Br. at 38), Defendants overlook how,

35

even without this evidence, the record still supports a finding that Plaintiff suffered a hostile work environment on the basis of national origin. In addition to Frattali's multiple racist comments, even after the January 12, 2014 statute of limitations cutoff, Frattali issued five disputed counseling memos in 2014 and accused Frattali of a potentially career-ending act of sabotage.

## Point II

### The jury instructions did not deprive Defendants of a fair trial

"We review a challenge to jury instructions *de novo*. 'A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury of the law.' We will reverse only if 'the charge, viewed as a whole, demonstrates prejudicial error.' Where a 'defendant requested a different jury instruction from the one actually given, the defendant 'bears the burden of showing that the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced.'" *U.S. v. Lange*, 834 F.3d 58, 75 (2d Cir. 2016).

Defendants claim the district court improperly declined to charge the jury on "business decision" and pretext. (Def. Br. at 45-46). Defendants also object to the district court's racial harassment charge to the extent it did not state the work environment must "alter" the terms of conditions of employment. *Id*. at 46. None

of these arguments warrant a new trial and, should this Court find the jury charge was improper, any such errors were harmless.

## A. The trial court was not required to charge the jury on pretext.

Defendants asked the district court to charge the jury that, to prevail on his hostile work environment claim, Plaintiff must show that their articulated reasons for the adverse job actions "were merely a pretext for unlawful discrimination based on plaintiff's race and/or national origin." (JA 451). The proposed charge further stated, "A pretext is proven when '(1) . . . the stated reasons were not the real reasons for [an employment action]; and (2) that [discrimination based on race or national origin] was the real reason for [an employment action]." *Id*. (alterations in original). This charge would have been inappropriate.

In *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134 (2d Cir. 2010), the district court issued a similar charge on pretext. *Id*. at 154 (charging the jury that, if defendant articulated a neutral reason, the jury should "determine whether plaintiff has satisfied you by a preponderance of the credible evidence that the reason offered by Wyeth for its decision or action is only a pretext or coverup for what was in truth a racially discriminatory motive"). This Court held that district courts should not charge the jury on pretext, as (1) such a charge "add[s] inappropriately to the plaintiff's burden" (*id*. at 155) and (2) "[a] plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the

sense of intentionally furnishing a justification known to be false. The crucial element of a claim under Title VII is discrimination, not dishonesty." *Id*. at 156.

As this Court in *Henry* has already deemed it "unwise for a court to charge the jury that a plaintiff must prove that the employer's explanation of an adverse action was a 'pretext'" (*id*. at 155), Defendants are not entitled to a new trial.

In addition, since Plaintiff pursued a hostile work environment case at trial and not a traditional *McDonnell-Douglas* disparate treatment claim, a pretext charge was not necessary, particularly since the district court gave the jury a thorough charge on racial harassment. (JA 1333-37).

## B. The trial court was not required to issue a "business decision" charge.

While this Circuit has not ruled on this issue, other courts have held that, provided the instructions otherwise properly charge the jury, defendants are not entitled to a "business judgment" charge in discrimination cases. In *Wichmann v. Bd. of Trustees of Southern Ill. Univ.*, 180 F.3d 791 (7th Cir. 1999), the Court ruled that, where the instructions stated that plaintiff must prove his age was a substantial motivating factor in his discharge, defendant was not entitled to a "business judgment" charge, as (1) "the jury is well-equipped to evaluate the evidence and use its 'good common sense' to come to a reasoned decision," (2) the court "need not deliver instructions describing all valid legal principles," (3) "the

judge may and usually should leave the subject to the argument of counsel" and (4) "a defendant cannot escape the fact that a jury must use its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext." *Id*. at 805; *see also Alvarado v. Federal Express Corp*., 384 Fed. Appx. 585, 588 (9th Cir. 2010) (ruling that the trial court was not required to give a "business judgment" charge where it "properly instructed the jury on the elements of the sexual harassment hostile work environment claim" and "[t]he instructions given would not have permitted the jury to find for Boswell based merely on finding that FedEx made an error in judgment, but only if it found that she was subjected to discrimination"); *Stemmons v. Missouri Dept. of Corrections*, 82 F.3d 817, 821 (8th Cir. 1996) (holding "the district court's failure to give a business judgment instruction was harmless error" because "[t]he department was given the opportunity to present evidence supporting its assertion that Mr. Fuzzell was selected for non-discriminatory reasons," "the department's attorney explained the business judgment rule to the jury during his closing argument" and "the court instructed the jury not to find for Ms. Stemmons if she would not have been selected regardless of her race"); *EEOC v. Dolgencorp, LLC,* 277 F. Supp. 2d 932, 950 (E.D. Tenn. 2017) (holding the district court was not required to charge the jury on "business judgment" because "the Sixth Circuit has provided that the business-judgment rule does not apply to

discrimination cases," and "the jury should determine whether a plaintiff has presented enough evidence 'that the employer made an unlawful business decision'") (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 395 n.6 (6th Cir. 2008)).

The trial court issued a comprehensive hostile work environment charge that repeatedly stated that Plaintiff had to prove he suffered unlawful discrimination on the basis of race and national origin. (JA 1334-37). Moreover, in summation, Defendants' counsel (1) provided their side of the story on every allegation that Plaintiff advanced during trial, (2) told the jury that Frattali denied him the JSA for "a sound business decision" (JA 1296), (3) offered neutral justifications for the boiler training denial (JA 1298-99), the watch engineer position (JA 1294-95), the meal reimbursement (JA 1295) and disciplinary memos (JA 1302-06, 1310-11), and (4) denied that Frattali made any racist comments. (JA 1293-95, 1300-01, 1307-08, 1312). As the charge instructed that Plaintiff had to prove discriminatory intent in order to prevail, and Defendants' counsel fleshed out their defenses in summation, the jury charge did not deny Defendants a fair trial.[1]

---

[1] Defendants also asked the district court to charge the jury that plaintiff had to prove that "race and/or national origin actually motivated" the adverse decisions. (JA 450). That proposed charge was also incorrect. *See Renz v. Grey Advertising, Inc.*, 135 F.3d 217, 222-23 (2d Cir. 1997) (holding that jury charge stating that plaintiff had to prove that "age was the real reason" for his discharge was erroneous, as "it failed to explain to the jury that age need not be the principal

## C. The hostile work environment charge was proper.

Defendants seek a new trial because the trial court did not instruct the jury that Plaintiff had to prove the hostile work environment "altered" the terms and conditions of his employment, or contained other language "indicating heightened impact caused by the harassment." (Def. Br. at 46). This argument provides no basis for a new trial.

The district court provided an extensive jury charge on the hostile work environment claim. (JA 1334-37). Judge Kuntz opened the charge by stating that Plaintiff had to prove in part that "the charged harassment was so severe or pervasive that it *affected* a term, condition, or privilege of employment." (JA 1334) (emphasis supplied). This language certainly noted the "heightened impact caused by the harassment." (Def. Br. at 46). There is no meaningful distinction between "affect" and "alter." "Affect" is defined as "to produce a material influence upon or alteration in." (www.merriam-webster.com/dictionary/affect). "Alter" is defined as "to make different without changing into something else." (www.merriam-webster.com/dictionary/alter). Lest there be any doubt, the district court went on to instruct the jury, "based on the totality of the circumstances, the plaintiff must prove, by a preponderance of the evidence, that the workplace was

---

reason for [the defendant's] decision") (quoting *Paolillo v. Dressler Industries, Inc.*, 865 F.2d 37, 40 (2d Cir. 1989)).

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to *alter* the conditions of the plaintiff's employment and create an abusive working environment." (JA 1335) (emphasis supplied). Defendants got the charge they wanted.

## Point III

### The damages award does not shock the conscience

"The 'calculation of damages is the province of the jury,' and 'we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages.' . . . We have observed repeatedly that juries have wide latitude in setting compensation for damages, stressing that our review is 'narrow,' considering [under federal law] only 'whether the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014).

"[T]he trial judge enjoys 'discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence,' and that '[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" *Lore v. City of Syracuse*, 670 F.3d 127, 176–77 (2d Cir. 2012). In determining whether the district court abused its discretion on the remittitur

motion, this Court "tak[es] into account amounts awarded in other, comparable cases." *Id*. at 177.

Courts have identified three categories of damages for pain and suffering in discrimination cases: (1) garden variety; (2) significant and (3) egregious. "'[E]gregious' emotional distress claims 'generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff.' In 'significant' or 'egregious' cases, where there is typically evidence of 'debilitating and permanent alterations in lifestyle,' larger damage awards may be warranted." *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46-47 (E.D.N.Y. 2009).

Plaintiff suffered egregious pain and suffering. The work-related stress caused depression, anxiety, impotency, insomnia, uncontrollable anger, erectile dysfunction and excessive drinking as he fought with -- and isolated himself from -- his family and went from being a "God-fearing man" to engaging in high-risk sexual behavior. Plaintiff met with two doctors, had repeated counseling visits and took medication for the mental health issues that had thrown him into a dark emotional hole. Contrary to Defendants' argument (Def. Br. at 50), these damages are egregious. In assessing Plaintiff's damages, the jury was free to consider how Port Authority's EEO office failed to take his internal complaints seriously, both allowing the harassment to continue unabated and signaling to Frattali that his

discriminatory harassment would go unpunished, causing Plaintiff further pain and humiliation as the harassment continued.

"In 'egregious' cases, damage awards in excess of $500,000 have been upheld." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 2d 306, 320 (S.D.N.Y. 2018). "Awards for [egregious damages] claims can far exceed $200,000, with awards of over $1 million reserved for the most egregious cases." *Ravina v. Columbia Univ.*, 16-CV-2137 (RA), 2019 WL 1450449, at *12 (S.D.N.Y. March 31, 2019). In *Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002), this Court upheld a $400,000 verdict in a harassment case ($570,161.49 in 2018 dollars), noting that "Plaintiff submitted evidence of ongoing harassment by each defendant over a five-year period. Phillips and her boyfriend testified in detail about her emotional distress, physical illness, and the effects of defendants' conduct on her lifestyle and relationships. Phillips' co-workers testified about the deterioration they observed in Phillips." *Id.* at 111-12; *compare Turley*, 774 F.3d at 146, 151-52, 163 (upholding award of $1.32 million for emotional distress where plaintiff was subject to "an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than three years," which caused post-traumatic stress disorder, short-term adjustment disorder, depression, a panic disorder, and multiple hospitalizations); *Osorio v. Source Enterprises*, 05 Civ. 10029, at *5 (JSR), 2007 WL 683985 (S.D.N.Y. March 5, 2007) (upholding $4

million for pain and suffering in retaliation case where "plaintiff testified at some length about the emotional distress and damage to reputation caused by the retaliation"); *Hughes v. PBA*, 850 F.2d 876 (2d Cir. 1988) (sustaining $275,000 in emotional damages [$589,139.37 in 2018 dollars] where plaintiff alleged a "campaign of harassment" in the workplace but he received no mental health treatment and made no claim of ongoing psychological problems); *Thorsen v. County of Nassau*, 772 F. Supp. 2d 277, 295 (E.D.N.Y. 2010) ($500,000 in emotional distress damages was not excessive where "the jury credited Thorsen's allegations that, not only did the defendants remove him from his job duties, but in doing so they subjected him to personal humiliation and attempted to destroy his professional reputation in retaliation for his political affiliation," and the plaintiff eventually stopped treatment and taking antidepressants); *Olsen*, 615 F. Supp. 2d at 47 (declining to remit the plaintiff's $400,000 award for pain and suffering where she "testified that the discrimination she suffered affected her 'immensely,'" and the discrimination caused her to feel "disillusioned and very disappointed" and "caused her to become very 'stressed' and 'anxious' about what would happen next at work (*i.e.*, would someone 'play a ridiculous prank' or 'say something offensive'), which carried over into her personal life," prompting her to seek counseling); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 197-98 (E.D.N.Y. 2006) (upholding $600,000 in pain and suffering where the disability discrimination caused the

plaintiff "great suffering," he lost interest in school, lost his appetite, cried for no reason, "displayed an overall demeanor that steadily worsened over time" and underwent psychiatric treatment).

In sum, while Defendants claim Plaintiff "was not subjected to shocking or egregious conduct" and "was not so affected by the harassment that he could not work or function generally," the record shows otherwise. The district court did not abuse its discretion in denying the remittitur motion.

## Point IV

### Port Authority cannot invoke the $300,000 statutory cap on Plaintiff's damages award

Damages for successful claims brought under 42 U.S.C. § 1981 are uncapped. 42 U.S.C. § 1981a(a)(1).[2] Citing the $300,000 cap under Title VII (42 U.S.C. § 1981(b)(3)(c)), Defendants argue that the damages cannot be allocated toward the § 1981 claim because Plaintiff did not establish a custom or policy of discrimination pursuant to *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). These arguments must fail.

---

[2] After Plaintiff filed this action, this Court held for the first time that 42 U.S.C. § 1981 does not provide a private right of action against state actors, and that the claims should be brought under § 1983. *Duplan v. City of New York*, 888 F.3d 612, 620 (2d Cir. 2018). This Court should therefore construe Plaintiff's § 1981 claim under § 1983.

Defendants never requested a policy and practice charge pursuant to *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). *See* JA 444-460 (Defendants' requests to charge). The only charge the district court provided the jury on municipal liability was that "Plaintiff's claims against Port Authority are based on the claim that defendant Frattali, as his supervisor, subjected him to a hostile work environment." (JA 1333). Defendants did not object to that charge, which applied a respondeat superior test. (JA 1092-1104). Nor did Defendants object to the verdict sheet, which neither asked the jury to find *Monell* liability nor sought to allocate damages among the parties, or between Title VII and § 1981. (JA 1104, 1400). As Defendants did not ask the district court to issue a policy or practice instruction, it cannot claim for the first time on appeal that the jury instructions denied them a fair trial.

Further confirming that Defendants have waived this argument, they did not seek dismissal on *Monell* grounds in support of their Rule 50(a) motion at trial (JA 1055-56) or invoke the damages cap in their post-trial motion. (EDNY ECF 86, at 20-22). Defendants did not assert this issue until their one-paragraph argument in the district court reply brief in further support of their motion to remit the damages. (ECF 93, at 9). Defendants have waived this issue. *See e.g. Gramercy Advisors, LLC v. Ripley*, 13–CV–9070 (VEC), 2014 WL 5847444, at *3 (S.D.N.Y. Nov. 12, 2014) (perfunctory and brief argument in reply brief constitutes waiver) (citing

*Knipe v. Skinner*, 999 F.3d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief")); *Gwozdzinsky v. Magten Asset Mgmt. Corp.*, 106 F.3d 469, 472 (2d Cir. 1997) ("[A]bsent manifest injustice or a showing of extraordinary need, we will not decide an issue on appeal not first presented to the district court").

Anticipating that Defendants may claim in their Reply Brief that they did not press the *Monell* at trial because the district court had already ruled on the summary judgment motion that Plaintiff did not have to put on policy or custom evidence against Port Authority (JA 440 n. 3), nothing prevented Defendants from reasserting this issue at trial, particularly when the district court was drafting the jury instructions and Defendants had the opportunity to ask the Court to instruct the jury that Plaintiff needed *Monell* evidence to prevail under § 1981. The Supreme Court recognizes that "'[Q]uestions going to the sufficiency of the evidence are not preserved for appellate review by a summary judgment motion alone' . . . rather, challenges of that order 'must be renewed post-trial under Rule 50.'" *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011). Defendants had ample opportunity to raise this issue following the summary judgment ruling, including on the Rule 50(a)(b) motions and during the charge conference. But after the district court resolved the summary judgment motion, Defendants abandoned this issue, until now. While Defendants may claim the § 1981/*Monell* is a purely legal

issue that can lay dormant until appeal, *see e.g. Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004), this was not a purely legal issue, as Defendants' waiver prejudiced Plaintiff, who would have been in a position to put on *Monell* evidence had Defendants raised this issue in support of their Rule 50(a) motion at trial. Moreover, to the extent parties may only preserve their appellate rights under Rule 50 by challenging the sufficiency of the evidence (*id.* at 284), Defendants argue throughout their appeal that Plaintiff did not introduce any policy or custom evidence under *Monell*. (Def. Br. at 39-41). If Defendants see fit to assert factual arguments under *Monell* on appeal, they should have done the same on the Rule 50(a)(b) motions. Their failure to do so constitutes waiver.

Even if Plaintiff cannot recover damages under § 1981 against Port Authority, he may recover damages against Defendant Frattali, against whom the jury found liability under that statute. (JA 1400). "[I]ndividuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson*, 375 F.3d at 226. The verdict sheet asked the jury to determine if Plaintiff proved "that he is entitled to compensatory damages from the Port Authority and from Gary Frattali" (JA 1400), imposing joint and several liability. If this Court imposes a $300,000 cap under Title VII against Port Authority, the remaining damages should be imposed against Frattali.

## Point V

## The punitive damages award is appropriate

### A. The standard of review is abuse of discretion.

It is conventionally stated that a federal court of appeals reviewing a district court's decision concerning a jury's punitive damages award reviews for abuse of discretion. . . . At the same time, however, . . . the discretion of the trial court on excessiveness is subject to substantial constraints. "If the question of excessiveness is close or in balance, we must affirm. . . . We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law."'

*Payne v. Jones*, 711 F.3d 85, 97–98 (2d Cir. 2013).

While *Payne* noted that the Supreme Court in *Cooper v. Industries, Inc. v. Leatherman Tool Group*, 532 U.S. 424 (2001), stated that constitutional challenges to punitive damages awards are reviewed *de novo*, that standard is not proper here because, as in *Payne*, Defendants have "argued excessiveness without invoking the Constitution." 711 F.3d at 99. While Defendants' point heading claims the punitive damages are constitutionally excessive (Def. Br. at 52), they press no constitutional arguments in challenging the award. *Id*. at 55-57. Instead, they argue that the discrimination was not egregious enough to warrant the award. (*Id*).

"The question faced by a federal court in reviewing a jury's verdict for excessiveness has long been whether the amount of the jury's award is 'so high as

to shock the judicial conscience and constitute a denial of justice.'" *Payne*, 711 F.3d at 96. Judicial review of a punitive damages award "is guided by three factors identified by the Supreme Court: '(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006). "[T]he degree of reprehensibility of the defendant's misconduct [is] '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'" *Payne*, 711 F.3d at 101. In challenging the punitive damages award, Defendants only argue that the evidence was not sufficiently egregious.

### B. The racial harassment was egregious enough to support the $150,000 punitive damages award.

The jury was outraged over Frattali's discriminatory and reprehensible conduct, as he interfered with Plaintiff's career growth, called him a "fucking Indian" and other racial slurs, issued Plaintiff baseless counseling memos and retaliated against Plaintiff by falsely accusing him of sabotaging equipment after Plaintiff filed discrimination charges that implicated Frattali. As Plaintiff is entitled to punitive damages, the $150,000 amount falls within the range in discrimination cases. *See e.g. Thomas v. iStar Financial, Inc.*, 652 F.3d 141, 149-150 (2d Cir. 2011) (remitting punitive damages award to $190,000); *Lewis*, 325 F.

Supp. 3d at 370 ("Comparable cases in the context of Title VII claims are constrained by the statutory caps, and have allowed plaintiffs . . . to recover $300,000 or the equivalent maximum statutory cap"); *Barham v. Wal-Mart Stores, Inc.*, No. 3:12-CV-01361 (VAB), 2017 WL 3736702, at *5 (D. Conn. Aug. 30, 2017) ("a punitive damages award of $175,000 appropriately reflects the malice and reckless indifference present in the evidentiary record here").

In attacking the punitive damages, Defendants minimize the evidence, claiming that "the only actions which were facially discriminatory were the three derogatory remarks, which Frattali denied making," and the remaining discriminatory actions were merely "part of Frattali's supervisory responsibilities to follow Port Authority procedures for training, meal allowance, and to ensure his subordinates performed safely and were capable of handling the equipment." (Def. Br. at 55-56). Yet, the jury did not see it that way, finding instead that Frattali discriminated against Plaintiff. While Defendants claim Plaintiff was not entitled to any punitive damages (*id.* at 56 ["The conduct attributed to Frattali does not rise to the level that permits a punitive damages award"]), Plaintiff addresses this one one-sided view of the evidence in defending the verdict on the merits. *See* Point I (B), *supra*. Defendants also minimize the nature of Plaintiff's pain and suffering, claiming he endured "non-disabling stress and insomnia" that lasted only three months. (Def. Br. at 56). But that is not what the record shows. The jury properly

inferred that Frattali abused Plaintiff because of his race, as shown by Frattali's racist comments and the various discriminatory job actions, including Fratalli's claim that Plaintiff had sabotaged the boiler. Frattali's behavior was reprehensible. Moreover, as a result of the racial harassment, Plaintiff engaged in self-destructive behavior, he took his stress out against his family, he began drinking excessively, he took medication for anxiety and other disorders and saw a psychiatrist 14 times.

The trial court rulings in Defendants' brief do not justify reducing the punitive damages. In *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403 (S.D.N.Y. 1996), while the retaliation was "severe" in that the plaintiff was fired, the Court reduced the punitive damages to $50,000 where the plaintiff complained about a suggestive image in the workplace, and she was not subjected to unwanted touching or demands for sex. *Id.* at 414-15. The jury in *Iannone* rejected the hostile work environment claim. *Id.* at 408. Similarly, in *Ettinger v. State Univ. of N.Y.*, 95 Civ. 9893 (RWS), 1998 WL 91089 (S.D.N.Y. March 2, 1998), the jury rejected the plaintiff's discrimination claim, only finding retaliation, and the plaintiff did not allege workplace harassment. *Id.* at *1-2, 11. *Lamberson v. Six West Retail Acquisition, Inc.*, 98 Civ. 8053, 2002 WL 59424 (S.D.N.Y. Jan. 16, 2002), is also a retaliation claim that did not involve a hostile work environment. In that case, the evidence of malice was "slight" and "Lamberson's 'victory' . . . was not a resounding one," resulting in a low "degree of reprehensibility." *Id.* at

*7. Unlike the instant case, none of these cases involve extensive workplace harassment and explicit racial slurs, causing extensive pain and suffering.

### C. The record does not show that the district court denied Frattali the opportunity to prove his net worth.

A punitive damages award should not be "so high as to result in financial ruin to the defendant." *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 373 (2d Cir.1988). "It is the defendant's burden to show that his financial circumstances warrant a limitation of the award." *Mathie v. Fries,* 121 F.3d 808, 816 (2d Cir. 1997).

Frattali seeks to reduce Plaintiff's punitive damages award because the district court denied him the opportunity to prove his net worth. (Def. Br. at 53-54). But the transcript does not show that Frattali's attorney tried to elicit information about his finances. (JA 1253-54). Frattali testified that this lawsuit "means monetary loss to me," and "I could lose my house or monetary loss." (JA 1253). The district court cut off counsel when she said, "I'm going to ask you some questions in connection with that liability with the Court's permission." (JA 1253-54). It was not clear that counsel wanted to introduce evidence of Frattali's finances, and when the district court closed off that inquiry, counsel neither objected nor tried to explain that she was trying to prove Frattali's net worth in reference to the punitive damages claim. (JA 1254). At no point during this

colloquy did counsel or Frattali even mention punitive damages. (JA 1253-54). As Frattali's counsel did not object when the district court ended this line of questioning, this appellate argument is waived. (JA 1254).

Moreover, courts have discretion to bifurcate trials when the plaintiff seeks punitive damages. *King v. Macri*, 993 F.2d 294, 298 (2d Cir. 1993). This would "avoid any undue prejudice during the liability phase." *Tillery v. Lynn*, 607 F. Supp. 399, 403 (S.D.N.Y. 1985). The defendant may also introduce evidence of his net worth in a post-trial motion to reduce the punitive damages award. *King*, 993 F.2d at 298. Frattali neither requested bifurcation nor tried to prove his net worth in the new trial motion.

Finally, since Frattali was acting within the scope of his employment (and Defendants have not argued otherwise), evidence of his net worth was irrelevant. *See Woods v. New York City Dep't of Sanitation*, No. 98 CIV. 6918 (JSM), 1999 WL 476305, at *4 (S.D.N.Y. July 8, 1999) ("the City may be obligated to indemnify the individual defendants if their conduct was within the scope of their duties"). While Defendants' counsel stated in support of the post-trial motion that "The Port Authority of New York and New Jersey does not generally indemnify its employees for punitive damage awards" (JA 1731 ¶ 2), that hearsay attestation is not enough to vacate the punitive damages award, especially since Frattali did not otherwise preserve his rights on this issue.

55

## Point VI

### The district court did not abuse its discretion
### in granting Plaintiff's motion for attorneys' fees

The district court "has wide discretion in determining the amount of attorneys' fees to award; thus, absent an abuse of discretion or an error of law we will not disturb the district court's assessment of the appropriate fee award." *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir. 1992).

Familiar with the case, and having reviewed Plaintiff's motion for attorneys' fees, the district court granted that application in full. (JA 2446). While Defendants argue that the district court granted that motion before they had an opportunity to file opposition papers (Def. Br. at 57), they made a full submission in support of their reconsideration motion (JA 2441-45 and EDNY ECF 103 [memorandum of law]), which the district court also rejected. (SPA 4).

Defendants have not shown the district court abused its discretion in granting the attorneys' fees motion. Their appellate arguments on this issue barely exceed one page, with conclusory arguments about Plaintiff's counsel's high billing rates, travel time and unsuccessful claims on the summary judgment motion. It is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Tolbert,* 242 F.3d at 75. Moreover, "merely incorporating by reference an

argument presented to the district court, stating an issue without advancing an argument, or raising an issue for the first time in a reply brief likewise did not suffice." *Norton v. Sam's Club*, 145 F.3d 114, 117–18 (2d Cir. 1998).

In any event, the hourly rates sought by Plaintiff are reasonable. While Defendants in the district court did not challenge the hourly rate of $450.00 for Marjorie Mesidor, Esq., or Stephen Bergstein, Esq., they challenged the associate hourly rates, for which Plaintiff sought between $250.00 and 300.00. (EDNY ECF 103, at 2-5). "In recent years, [attorneys'] fees have been awarded in the Eastern District of New York at an hourly rate of $300 to $450 for partners and $100 to $325 for associates in civil rights cases." *Thomas v. City of New York*, 14-cv-7513 (ENV) (VMS), 2017 WL 6033532, at *4 (E.D.N.Y. Dec. 1, 2017).

In the district court, Defendants also sought to reduce the overall fees because Plaintiff lost several claims on the summary judgment motion. (EDNY ECF 103, at 8-9). Yet, Plaintiff challenged as discriminatory a host of adverse employment decisions and harassing conduct over the course of several years of employment. As outlined in Defendants' memorandum of law on attorneys' fees in the district court, the failed claims related to the successful claims, as the latter addressed counseling memoranda in 2014 and retaliatory harassment. *Id*. at 8. However, "in awarding attorneys' fees, 'the most critical factor is the degree of success obtained.'" *Patterson*, 440 F.3d at 123. "The District Court may, in its

discretion, 'attempt to identify specific hours that should be eliminated, or it may simply reduce the [requested] award to account for the limited success.'" *Abrahamson v. Bd. of Educ.*, 374 F.3d 66, 79 (2d Cir. 2004). "Work on ultimately unsuccessful claims is compensable as long as those claims are not 'wholly unrelated' to the claims plaintiff succeeded on at trial." *Tatum v. City of N.Y.*, No. 06-cv-4290 (PGG) (GWG), 2010 WL 334975, at *3 (S.D.N.Y. Jan. 28, 2010). *See also Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. . . . In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters"). On appeal, Defendants have not argued precisely how the claims that failed on the summary judgment motion were distinct from the successful claims. The fee award should stand.

## Conclusion

Defendants have not identified any basis to disturb the verdict. Nor have they have shown the damages award was excessive. In addition, the district court did not abuse its discretion in granting Plaintiffs' motion for attorneys' fees. This Court should affirm the verdict in full.

Dated: June 14, 2019

Respectfully submitted,

*s/Stephen Bergstein*
STEPHEN BERGSTEIN

BERGSTEIN & ULLRICH, LLP
5 Paradies Lane
New Paltz, New York 12561
(845) 468-1277
steve@tbulaw.com

MARJORIE MESIDOR

PHILLIPS & ASSOCIATES
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431 ext. 204
mmesidor@tpglaws.com

*Attorneys for Plaintiff-Appellee*

## Certificate of Compliance

Stephen Bergstein, counsel for Plaintiff-Appellee, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is Times New Roman 14-point. The brief contains 13,812 words.

*s/Stephen Bergstein*
Stephen Bergstein
